STATE OF CONNECTICUT *v.* DONALD FIELDS
(SC 16695)

Borden, Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued March 19—officially released August 5, 2003

*Mark Rademacher*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *John Davenport*, assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Donald Fields, appeals[1] from the judgment of conviction, following a jury trial,

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

of felony murder in violation of General Statutes § 53a-54c,[2] attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 (a) (2)[3] and 53a-134 (a) (2),[4] and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48

---

[2] General Statutes § 53a-54c provides: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, kidnapping, sexual assault in the first degree, aggravated sexual assault in the first degree, sexual assault in the third degree, sexual assault in the third degree with a firearm, escape in the first degree, or escape in the second degree and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants, except that in any prosecution under this section, in which the defendant was not the only participant in the underlying crime, it shall be an affirmative defense that the defendant: (1) Did not commit the homicidal act or in any way solicit, request, command, importune, cause or aid the commission thereof; and (2) was not armed with a deadly weapon, or any dangerous instrument; and (3) had no reasonable ground to believe that any other participant was armed with such a weapon or instrument; and (4) had no reasonable ground to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury."

[3] General Statutes § 53a-49 (a) provides: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: (1) Intentionally engages in conduct which would constitute the crime if attendant circumstances were as he believes them to be; or (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[4] General Statutes § 53a-134 provides: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or (3) uses or threatens the use of a dangerous instrument; or (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm, except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of, robbery in the second degree, robbery in the third degree or any other crime.

"(b) Robbery in the first degree is a class B felony provided any person

(a)[5] and 53a-134 (a) (2). The defendant claims that the trial court improperly denied his motion to suppress his confession because: (1) under the circumstances of the case, the state did not meet its burden of proving that the confession was voluntary; and (2) the state did not scrupulously honor the defendant's right to remain silent.[6] The defendant also claims that the state's final argument deprived him of a fair trial. We affirm the judgment of the trial court.

The state charged the defendant with felony murder, attempt to commit robbery in the first degree, and conspiracy to commit robbery in the first degree. Prior to trial, the defendant moved to suppress his confessions. The trial court, *Damiani, J.*, denied the motion. Following a jury verdict of guilty, the trial court, *O'Keefe, J.*, rendered judgment of conviction on the verdict. This appeal followed.

The jury reasonably could have found the following facts. On November 1, 2000, at approximately 8:45 p.m., the victim, Milton Velez, and David Gonzalez were walking to a convenience store on Lounsbury Street in Waterbury, when the defendant and Terrence Thomp-

---

found guilty under subdivision (2) of subsection (a) shall be sentenced to a term of imprisonment of which five years of the sentence imposed may not be suspended or reduced by the court."

[5] General Statutes § 53a-48 provides: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy.

"(b) It shall be a defense to a charge of conspiracy that the actor, after conspiring to commit a crime, thwarted the success of the conspiracy, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose."

[6] The defendant also claims that his waiver of his right to remain silent, under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), was not voluntary. This claim, however, is simply a reassertion of his first two claims, which we reject. Our rejection of this claim, therefore, is subsumed in our rejection of his first two claims.

son, who was armed with a handgun, approached them. The defendant and Thompson had driven to the scene, with a third person, Mark Symms, in a white Nissan Maxima. In an attempt to rob the victim and Gonzalez, Thompson grabbed Gonzalez from behind, and pointed the gun at his head and waved it at the victim's face. After a brief verbal exchange, Thompson fired two shots at the victim. The fatal shot struck the victim in the back and passed through his right lung and heart, and lodged in his chest. The defendant and Thompson then fled the scene in the Maxima, which was driven by Symms.

Witnesses called the police promptly, and approximately fifteen minutes after receiving the police broadcast describing the assailants and the vehicle, Officer Stephen Jeanetti, of the Waterbury police department, apprehended the defendant and Thompson standing near the Maxima located in a parking lot near a café. Jeanetti found the handgun from which the fatal bullet had been fired in the grass approximately two feet from the defendant. The police took Gonzalez to the parking lot, and he identified the defendant and Thompson as the assailants. He later also identified them from photographic arrays. Ballistics evidence established that the bullet found in the victim's body matched the gun found near the defendant.

After his arrest, the defendant was first interviewed at the police station by Detective Angel Robles and, later, by Detective Anthony Rickevicius. Some time after midnight on November 2, 2000, the defendant gave Robles a written confession. The substance of that confession was as follows. On the evening of November 1, Thompson picked the defendant up in the Maxima. A second person, named Mark, was in the car. The three of them drove around for approximately two hours, during which time Thompson discussed the possibility of robbing someone, because he needed money. They

parked near a store, bought some food, and ate it in the car. Thompson then said, " 'I'm about to jump out,' " which, the defendant understood, meant that Thompson intended to rob someone. The defendant responded: "[W]hat, you want me to go with you?" He and the defendant then left the car and approached two men. Thompson pointed the gun at the men, and ordered them to get on the ground and empty their pockets. When one of the men said something to Thompson and brushed the gun away, Thompson fired two shots. They then ran back to the Maxima, and Mark drove them away. Mark then left the car, and the defendant and Thompson drove to the café and parked. When a man who had approached them to buy drugs indicated that the police were approaching, Thompson threw the gun down.

Later, at approximately 6 a.m., the defendant gave Rickevicius a written statement. In this statement, the defendant identified Symms as "Mark," and described his role as the driver of the getaway car.

## I

## THE MOTION TO SUPPRESS

The defendant moved to suppress his written confession to Robles.[7] After a pretrial evidentiary hearing, the trial court, *Damiani, J.*, denied the motion.

## A

The defendant first claims that the trial court improperly denied his motion to suppress his confession because, it being established that he suffered physical injuries while in police custody, the state had the burden

---

[7] Although, in both the trial court and in this court, the defendant focused only on the written confession to Robles that was admitted into evidence, and did not specifically refer to the written confession to Rickevicius, which was also admitted into evidence, we assume that his challenge extends to both confessions.

under the due process clause of the United States constitution to prove that the injuries were not the result of physical violence at the hands of the police.[8] More

[8] We note that the defendant also asserts that this claim is supported by the due process clause of our state constitution. The defendant offers no independent analysis, however, under the particular provisions of our due process clause; therefore, he has abandoned the state constitutional aspect of this claim. See *State* v. *Smith*, 255 Conn. 830, 835 n.12, 769 A.2d 698 (2001) ("Although the defendant also claims a violation under the state due process clause, our decision is confined to the federal constitution because the defendant has failed to provide an independent analysis of the state constitutional issue. See *State* v. *Ellis*, 232 Conn. 691, 692 n.1, 657 A.2d 1099 (1995). We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim . . . . *State* v. *Robinson*, 227 Conn. 711, 721–22, 631 A.2d 288 [1993]; see also *State* v. *Williams*, 231 Conn. 235, 245 n.13, 645 A.2d 999 [1994]; *State* v. *Joyner*, 225 Conn. 450, 458 n.4, 625 A.2d 791 [1993]; *State* v. *Rosado*, 218 Conn. 239, 251 n.12, 588 A.2d 1066 [1991]." [Internal quotation marks omitted.]); see generally *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992) (setting forth appropriate analytical framework for presenting distinct state constitutional claim).

In his brief, the defendant has alluded to some sister state opinions, and such decisions can be a relevant factor in assessing a state constitutional claim. See *State* v. *Geisler*, supra, 222 Conn. 685. In the absence of any relation to "the particular provisions of the state constitution at issue," however, that reference is insufficient to preserve a distinct claim under the Connecticut constitution. (Internal quotation marks omitted.) *State* v. *Smith*, supra, 255 Conn. 835 n.12. Moreover, the defendant offers no discernible argument relating those sister state decisions to any distinct features of our state constitution. First, the defendant cites the decision of the Court of Appeals of Texas in *McBride* v. *State*, 803 S.W.2d 741 (Tex. App. 1990). *McBride* involved a straightforward *federal* due process analysis of the voluntariness of a confession in an inapposite factual setting. The court in *McBride* held that, under the totality of the circumstances, which included evidence that the defendant in that case had been beaten by the police, coupled with the state's failure to call any of the police accused to answer the allegations, the state had failed to meet its burden of establishing that a confession was voluntary, as required under the federal due process clause. Id., 744–45, citing *Jackson* v. *Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964). Therefore, *McBride* does not support any independent state constitutional analysis. Next, the defendant cites *State* v. *Peters*, 315 So. 2d 678 (La. 1975). In *Peters*, the Supreme Court of Louisiana construed its own extensive state statutory provisions governing the admissibility of confessions, and concluded that, under those provisions, it was well established

specifically, he does not contend that the "state is . . . required to explain every injury sustained by a defendant while in police custody in order for a confession to be admissible. Where the sole evidence of coercion is the defendant's testimony, and that testimony is contradicted by witnesses for the state, the trial court may choose to believe the prosecution's witnesses. Only where it is evident that a defendant has been injured while in police custody, such as where he offers medical records, photographs, or third party observations that show he was injured, and the only issue is how and why the injuries were inflicted, must the state shoulder the burden of proving that the injuries were not inflicted as a means of producing the confession by providing testimony about how, when or by whom the defendant was injured." Moreover, the defendant contends, the state must prove by clear and convincing evidence that the injuries were not inflicted by the police. Under the circumstances of the present case, we decline to adopt the rule urged by the defendant.

The evidence pertaining to this claim, as disclosed both by the hearing on the motion to suppress and subsequent testimony at trial; *State* v. *Toste*, 198 Conn. 573, 576, 504 A.2d 1036 (1986) (record on review of ruling on pretrial motion to suppress includes evidence adduced at trial); was as follows.

The defendant testified at the hearing on the motion as follows. The defendant was sixteen years old when

that the state carries the burden of "proving *affirmatively* and *beyond a reasonable doubt* that the statement was made freely and voluntarily by the defendant and not through coercion." (Emphasis in original.) Id., 681. The defendant does not relate the statutory provisions at issue in *Peters* to any particular provisions of our state constitution. Finally, the defendant cites the decision of the Supreme Court of Illinois in *People* v. *Wilson*, 116 Ill. 2d 29, 506 N.E.2d 571 (1987). As with *McBride*, *Wilson* involved strictly a federal due process analysis, premised on United States Supreme Court jurisprudence. Id., 40, citing *People* v. *Thomlison*, 400 Ill. 555, 561–62, 81 N.E.2d 434 (1948), which relied exclusively on federal due process law. Accordingly, the defendant's state due process claim is abandoned.

he was arrested on the evening of November 1, 2000, and he had no bruising or swelling on his face when he arrived at the police station. He stated that he was seated, with his hands handcuffed behind his back, in an interview room. Detective Robles, whom the defendant described as "Latino," entered the room and asked him if he wanted to give a statement, and the defendant replied, "[N]o." Robles then left, returned approximately one or two hours later, and asked the defendant again if he wanted to make a statement, and he again said, "[N]o." After Robles left the room, another detective entered the room. This detective was white, older and taller than the defendant, who was five feet, four inches tall, but no more than six feet, two inches tall. This detective's hair was black and gray, with a bald spot in the front of his head. The defendant was sure that this detective was "Detective Jones," because he had heard Robles refer to him by that name in a court appearance previous to the hearing on the motion. The defendant was certain that the only two detectives who came into the room with him were Robles and Jones.

After Robles left the room the second time, Jones, with his left hand, grabbed the defendant's hair and then hit the defendant on the left side of the face, in the eye region, with the right hand. The defendant stated that, as he started to fall off the chair, Jones, with his right hand, grabbed the defendant's coat and hit the defendant on the right side of his face with the left hand. After he fell out of the chair, Jones kicked him in the back and ribs. This entire beating took approximately one or two minutes, during which time Jones asked him if he still did not want to cooperate. While he was on the floor he started to cry and asked Jones to stop hitting him, and through the open door, he could see Robles outside the room. After Jones stopped hitting and kicking him, the defendant returned to his seat. Robles then came back into the room and asked

the defendant if he "now" wanted to give a statement. The defendant then said, "[Y]es," if they would stop hitting him, because he did not want to be hit anymore. Thereafter, he signed the two statements. After the beating, his right cheek was swollen and he had a "knot" on the left side of his head. He spent the night in the room, handcuffed, and the police took a photograph of him "that morning" before he went to court.

The trial evidence indicated that the defendant was booked and photographed at 1:46 p.m. on November 2, 2000, and the photograph showed a swollen area below his right eye, and his shirt torn. When he went to court the next day, his attorney, a public defender, asked the defendant what had happened to his face, and he told her that a policeman had beaten him in order to make him confess.

In addition, the defendant's mother testified at the hearing and at trial, stating that when she saw the defendant in court on November 2, 2000, his right cheek was swollen, he had a "big knot" on the left side of his head, and he was limping. Further, Theresa M. Dalton, the public defender who had represented the defendant at his arraignment in the late afternoon of November 2, 2000, testified at the hearing that, when she saw the defendant that morning, he had scratches on his neck, a mark under his eye, and he was limping. She also testified that the defendant told her he had been hit by a policeman, and that he gave the self-incriminating statements to the police because the policeman had hit him. At the arraignment, Dalton represented the defendant, Thompson and Symms. At trial, Dalton again described the defendant's injuries when she saw him on the day of the arraignment, and she testified that she had discussed the injuries with him, although she was not permitted to testify as to the contents of that conversation. She testified further that, after she had noticed the defendant's injuries, she told the sheriff

to keep the defendant separated from Thompson and Symms because she would be telling them about the defendant's statements implicating them.

Detective William Howard Jones testified at the hearing that, on the night in question, he was assisting Robles in the investigation. It was Robles' first homicide investigation and Jones "just stood by him to make sure all the rules were adhered to, such as rights . . . ." Jones denied having beaten the defendant. The trial court took judicial notice of the fact that Jones' hair was "practically all silver except for a little black on the side. He has a full head of hair. [There are] no bald spots . . . ." Jones also described all of the other nonuniformed policemen who were there that evening, none of whom matched the description given by the defendant of the policeman who purportedly had beaten him. He also testified that, when he saw the defendant in the interview room, there was nothing out of the ordinary about his face.

Robles testified at the hearing that the defendant was not handcuffed while he was in the interview room. He denied striking the defendant or seeing Jones or anyone else strike him. Robles testified that he did not see anyone besides himself or Jones enter the interview room, that the defendant's face looked no different at the end of the evening, after the interrogation had been completed, from its appearance at the beginning of the evening, and that he saw no bruises, swelling or scratches on his face. At the conclusion of Robles' testimony on the motion to suppress, the defendant's counsel represented to the court that the defendant would *now* say that Jones was *not* the policeman who beat him. At trial, Robles testified further that, after the defendant had completed giving his statement to Jones at approximately 3:30 a.m., he was brought down to the police "lockup" and put in a cell.

At trial, Detective Rickevicius testified that on the morning of November 2, 2000, he took a statement from the defendant regarding the third person in the car. He also testified that this interview took place between approximately 6 a.m. and 6:15 a.m., that the defendant had no marks on this face, and that he did not hit the defendant.

The trial court, *Damiani, J.*, denied the motion to suppress. The court made the following specific findings of fact: "As to the defendant's claim that the defendant was physically beaten to give the statement, this court does not find this claim supported by . . . credible evidence. The defendant claimed that Detective Jones beat him, yet during argument by defense counsel, it was stated that Detective Jones was not the individual who allegedly beat [the defendant] on the night of [November 1, 2000 to November 2, 2000]. Through examination of Detective Jones it was shown that none of the detectives on duty that night matched the description given by the defendant. There is no question the defendant entered the detective bureau on the night of [November 1] without any bruises to his face and when he appeared in court he, in fact, had bruises on his face. How, when, and where this happened, and who did it would be mere speculation on the part of this court. This court cannot engage itself in speculation."

As the defendant aptly notes, although ordinarily the voluntariness of a confession is determined under the totality of the circumstances; *State* v. *Pinder*, 250 Conn. 385, 418–20, 736 A.2d 857 (1999); a different rule applies when a confession is accompanied by physical force. "[C]onfessions accompanied by physical violence wrought by the police have been considered per se inadmissible. *Stein* v. *New York*, 346 U.S. 156, 182, 73 S. Ct. 1077, 1091, 97 L. Ed. 1522 (1953), overruled on other grounds . . . *Jackson* v. *Denno*, 378 U.S. 368, 84 S. Ct. 1774, 12 L. Ed. 2d 908 (1964); *Miller* v. *Fenton,*

796 F.2d 598, 604 (3d Cir. 1986) (noting that per se involuntariness rule applies when an interrogation is accompanied by physical violence), cert. denied, 479 U.S. 989, 107 S. Ct. 585, 93 L. Ed. 2d 587 (1986). See also *Cooper* v. *Scroggy*, 845 F.2d 1385, 1390 (6th Cir. 1988) (The use of physical force by interrogators creates a heavy presumption, if not a per se rule, that there has been a violation of due process.) . . . .

"Such confessions properly are presumed involuntary because of, among other things, both their unreliability and the great likelihood that the use or threatened use of violence overbears a suspect's will. As *Stein* noted: Physical violence or threat of it by the custodian of a prisoner during detention serves no lawful purpose, invalidates confessions that otherwise would be convincing, and is universally condemned by the law. When present, there is no need to weigh or measure its effects on the will of the individual victim. The tendency of the innocent, as well as the guilty, to risk remote results of a false confession rather than suffer immediate pain is so strong that judges long ago found it necessary to guard against miscarriages of justice by treating any confession made concurrently with torture or threat of brutality as too untrustworthy *to be received as evidence of guilt. Stein* [v. *New York,* supra, 346 U.S. 182] . . . ." (Emphasis in original; internal quotation marks omitted.) *United States* v. *Jenkins,* 938 F.2d 934, 938 (9th Cir. 1991).

The defendant claims, however, that there is an additional presumption under the due process clause of the federal constitution. The defendant claims that a confession must be presumed to be the product of physical violence, and thus involuntary under the principle discussed previously, if evidence is submitted establishing that the defendant has sustained a physical injury while in police custody. The defendant contends that the state can rebut this presumption only by submitting

clear and convincing evidence otherwise explaining the source of the injury. No such presumption exists under federal due process jurisprudence.

When we review the voluntariness of a confession, our scope of review is plenary on the ultimate question of voluntariness. *State* v. *Pinder*, supra, 250 Conn. 421. Nonetheless, "[t]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . which will not be overturned unless they are clearly erroneous." (Internal quotation marks omitted.) Id., 420. Thus, this limited scope of review applies to the findings regarding whether physical force was used in obtaining the confession. Id.; *United States* v. *Jenkins*, supra, 938 F.2d 938. Applying this standard of review, we conclude that the trial court's finding that the police had not exerted physical violence to coerce the defendant's confession is not clearly erroneous.

The record clearly establishes that the defendant was not bruised when he entered the interview room at some time in the evening of November 1, 2000, that he left the room at approximately 3:30 a.m. on the morning of November 2,[9] and that he was bruised when his booking photograph was taken at 1:46 p.m. on November 2, before being taken to court for arraignment. The trial court did not credit his testimony that a policeman inflicted the bruises while he was in the interview room, particularly considering his initial testimony that it was Jones who had hit him, which was controverted by the subsequent representation of his counsel that he would now testify that it was not Jones who had hit him, and also considering the evidence that none of the officers on duty that evening matched the defendant's descrip-

[9] The defendant did not claim in the trial court, and does not claim here, that Rickevicius inflicted his injuries when he took the defendant's statement at 6 a.m. Also, he does not challenge Rickevicius' testimony that the defendant was not bruised when he gave his statement at that time.

tion of his police assailant. Implicit in the trial court's rejection of the defendant's testimony, moreover, along with its finding that "the defendant made a knowing, intelligent, and voluntary waiver of his right [against] self-incrimination," is its acceptance of both Robles' and Jones' denials of having hit the defendant. The court's findings necessarily mean, therefore, that the bruises were inflicted at some time after 3:30 a.m., when the defendant was brought down from the interview room to the lockup, and before 1:46 p.m., when he was photographed.[10]

The defendant relies on *Sims* v. *Georgia,* 389 U.S. 404, 88 S. Ct. 523, 19 L. Ed. 2d 634 (1967), as well as four state court decisions; *Smith* v. *State,* 254 Ark. 538, 494 S.W.2d 489 (1973); *People* v. *Wilson,* 116 Ill. 2d 29, 506 N.E.2d 571 (1987); *State* v. *Peters,* 315 So. 2d 678 (La. 1975); and *McBride* v. *State,* 803 S.W.2d 741 (Tex. App. 1990); in an effort to support his proposition that where it is established that a defendant who confessed has been injured while in police custody, the state must prove that the injuries were not inflicted as a means of producing the confession by providing evidence establishing how, when or by whom the defendant was injured. We are not persuaded.

In *Sims,* it already had been established, in a prior appeal, that the defendant had been injured while in a physician's office to which he had been taken by policemen, and that the physician could not testify that the policemen did not inflict the injuries because the physician was not in the room with the defendant and

---

[10] We agree with the trial court that it would require speculation to determine when and how the defendant suffered the bruises, and at whose hands. We do not know, for example, whether Thompson, Symms, or both, were also in the lockup with the defendant and had learned that he had given statements implicating them, or whether the defendant was in a fight with another arrestee in the lockup. Furthermore, the defendant himself might have inflicted the injuries.

the policemen at all times. *Sims* v. *Georgia*, supra, 389 U.S. 406. Upon remand, the state failed to call any of those policemen to rebut the defendant's "testimony that he had been subjected to physical violence prior to his confession." Id. On those facts, the United States Supreme Court held that "[t]he State had every opportunity to offer the police officers, whose failure to testify had already been commented upon here, to contradict [the defendant's] version of the events. Its failure to do so when given a second chance lends support to the conclusion that their testimony would not, in fact, have rebutted [the defendant's]." Id.

*Sims* does not stand, therefore, for the broad proposition suggested by the defendant in the present case. It holds no more than that, where it is established that the defendant was in police custody and was physically injured before confessing, the failure of the state to present any of the officers who were present during the critical times in question may render the state's evidence regarding voluntariness of the confession insufficient. Much to the same effect are *Smith* v. *State*, supra, 254 Ark. 538, and *McBride* v. *State*, supra, 803 S.W.2d 741. In *Smith*, the Arkansas Supreme Court held that the unexplained failure by the state to call several witnesses alleged to have exerted, or witnessed, physical violence leading to a confession was relevant to determining the voluntariness of that confession. *Smith* v. *State*, supra, 541–42. Specifically, the court stated "whenever the accused offers testimony that his confession was induced by violence, threats, coercion, or offers of reward then the burden is upon the state to produce all material witnesses who were connected with the controverted confession or give adequate explanation for their absence." Id., 542. Likewise, the court in *McBride* held that, under the totality of the circumstances, which included evidence that the defendant in that case had been beaten by the police, coupled

with the state's failure to call any of the police accused to answer the allegations of violence, the state had failed to meet its burden of establishing that a confession was voluntary, as required under the federal due process clause. *McBride* v. *State*, supra, 744–45, citing *Jackson* v. *Denno*, supra, 378 U.S. 368. The present case is distinguishable. First, it was not established that the defendant confessed only after having been beaten. Indeed, the defendant's testimony to that effect was subject to critical flaws, namely, his withdrawal of his accusation of Jones as his assailant, and the fact that none of the policemen on duty matched the description given by the defendant. Second, the state did call all of the policemen who were present during the questioning. The state presented the testimony of both Jones and Robles, the two officers whom, at least initially, the defendant had implicated as having beaten him and having observed the alleged beating. The testimony of both officers rebutted the defendant's claim of physical violence.

For different reasons, *State* v. *Peters*, supra, 315 So. 2d 678, does not support the defendant's federal due process claim. In *Peters*, the Supreme Court of Louisiana construed *its own extensive state statutory provisions* governing the admissibility of confessions, and concluded that, under those provisions, the state carried the burden of "proving *affirmatively* and *beyond a reasonable doubt* that the statement was made freely and voluntarily . . . ." (Emphasis in original.) Id., 681. The defendant does not in any way relate *Peters* to his due process claim, which arises under the federal constitution.

Only *People* v. *Wilson*, supra, 116 Ill. 2d 29, actually stands for the broad proposition urged by the defendant. We decline to follow it, however. Neither the facts of this case nor our experience with claims of involuntariness in general persuade us of its necessity. The

general rule that leaves questions of credibility to the trial court ordinarily will provide ample protection for a defendant who claims that his confession was physically coerced.

This does not necessarily mean that, in an appropriate case, we would not deem the state's simple denials of police inflicted physical violence against a defendant while in police custody insufficient to rebut a defendant's credible claim of such violence. This is not such a case, however, because of the trial court's justified rejection of the defendant's testimony and the fact that all of the material witnesses did testify. Thus, we have no occasion in the present case to consider adopting the broader, more prophylactic rule urged by the defendant.

B

The defendant next claims that his confession should have been suppressed because the police did not scrupulously honor his right to remain silent in violation of the rule set forth by the United States Supreme Court in *Michigan* v. *Mosley*, 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). We disagree.

The facts regarding this claim, as established by the testimony at both the hearing and the trial, and the findings of the trial court, are as follows. At some time between 10 and 11 p.m., Robles and Jones entered the interview room, advised the defendant of his *Miranda* rights, and asked him if he would give a statement, and he refused. Approximately one hour later, they again entered the room and asked the defendant if he wanted to cooperate, and he again refused. At some time around or after midnight, Robles again entered the room and told the defendant that they had information placing him at the scene of a homicide, and the defendant said that he would cooperate. Robles then again read the defendant his *Miranda* rights, the defendant executed a written waiver of those rights, and he then gave his

written statement. Therefore, the time span between the first, unsuccessful effort to question the defendant, and the third, successful effort, was approximately two hours.

"In *Michigan* v. *Mosley*, [supra, 423 U.S. 97], the defendant was arrested for robbery. After effecting the arrest, a police officer advised the defendant of his *Miranda* rights and had him read and sign the constitutional rights notification certificate. Id. When the officer began to interrogate him about the robbery, the defendant refused to talk and the officer then ceased the interrogation. Id. The questioning lasted approximately twenty minutes. At no time during the questioning did the defendant request to speak with a lawyer. Approximately two hours later, another police officer brought the defendant to an interview room in order to interrogate him about a separate incident, a murder. Id., 97–98. That officer advised the defendant of his *Miranda* rights and had him sign the constitutional rights form. Id. During the interrogation, the defendant made a statement implicating himself in the murder. Id., 98. That interrogation lasted approximately fifteen minutes and at no point during its course did the defendant request to speak with a lawyer. Id. The defendant moved to suppress the statement.

"The United States Supreme Court held that the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored. Id., 104. The court then concluded that the defendant's right to cut off questioning was fully respected because: (1) the first interrogating police officer had immediately ceased his interrogation when the defendant invoked his right to remain silent; (2) the second interrogating police officer had waited a significant period of time, more than two hours, before reinterrogating the defendant; (3) the reinterrogation

concerned a crime unrelated to the first interrogation; and (4) before the second interrogation began, the defendant had been advised of his *Miranda* rights and had waived those rights. Id., 104–105." (Internal quotation marks omitted.) *State* v. *Stanley*, 223 Conn. 674, 691–92, 613 A.2d 788 (1992).

"The purpose of the 'scrupulously honor' test is to avoid situations where the police fail 'to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.' [*Michigan* v. *Mosley*, supra, 423 U.S.] 105–106." *State* v. *Stanley*, supra, 223 Conn. 694. "*Miranda* should not be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent. [*Michigan* v. *Mosley*, supra, 102–103]. . . . The circumstances of each case determine whether the right to cut off questioning was scrupulously honored." (Internal quotation marks omitted.) *Kelly* v. *Lynaugh*, 862 F.2d 1126, 1130 (5th Cir. 1988). We agree with the state that the defendant's right to remain silent was scrupulously honored.

The only differences between the present case and *Mosley* are that, in the present case, the police interrogated the defendant about the same crime rather than a different crime, and in the present case the police interrogated the defendant three times rather than twice. Those differences, however, are immaterial.

In *Stanley*, we rejected the notion that *Mosley* precluded reinterrogation of a suspect about the same crime that he earlier had refused to discuss. *State* v. *Stanley*, supra, 223 Conn. 693. Similarly, the addition of one intervening and unsuccessful attempt to interrogate the defendant did not amount to a violation of *Mosley*.

Compare *Kelly* v. *Lynaugh*, supra, 862 F.2d 1130–31 (three efforts to interrogate defendant, first two of which ceased promptly upon defendant's refusal to speak). Furthermore, the third interrogation was preceded by the police telling the defendant that they had information placing him at the scene of a homicide, thus giving him the opportunity to reevaluate his decision about whether to cooperate. Under these circumstances, asking the defendant whether he now wished to cooperate did not amount to repeated efforts to wear down his resistance and make him change his mind.

## II

### THE STATE'S FINAL ARGUMENT

The defendant also claims that his due process right to a fair trial was violated by four improper arguments made by the state during its final rebuttal argument, which followed the defendant's final argument. We reject this claim.

We discuss in turn each challenged argument of the state, the defendant's objection at trial thereto, if any, and the trial court's responses. The defendant first challenges the state's argument to the jury that his confession was reliable because the trial court had admitted it into evidence.[11] The defendant objected, and the court stated, "I don't think that can be argued from the evidence." The assistant state's attorney replied, "Fair enough," and then argued, "You have before you lawful evidence you can look at. That statement is here because it's admissible, it's lawful, and it's relevant." In addition to objecting at the time of the statement,

---

[11] The assistant state's attorney argued: "[The judge's] job is to give [the defendant] a fair trial, his job, he told you, is to make rul[ings] on the admissibility of evidence, evidence that comes in before this jury. . . . [A]nd you are going to see a court exhibit, and you are going to see on the front page, [s]uppression [h]earing. And you heard about all these hearings you had, this is the question I want to ask. Did a judge of the Superior Court in the state of Connecticut let you see a confession?"

the defendant moved for a mistrial after the arguments, citing the state's improper argument.

The defendant next claims that the state improperly commented on his failure to testify regarding his claim that he had been beaten in order to make him confess. Specifically, the state argued: "[Defense counsel] never asked, who were the other cops. Let's bring in all the cops. *Who beat you up? Let's go. Robles beat me up. Jones beat me up. Did somebody come in and say that? No.*"[12] (Emphasis added.) The defendant moved for a mistrial after the state's final rebuttal argument, citing the state's comment on his failure to testify.

The trial court denied the motion for a mistrial, stating that it would "handle both situations with as complete and as forceful cautionary instructions as I can think of." Accordingly, in instructions to the jury, the court specifically told the jury that it could not infer that the confession was valid and reliable because a judge had admitted it, and that its significance, and whether it was the product of duress, were questions

---

[12] This statement was made in the context of a broader argument that there was an absence of evidence supporting the defendant's claim of physical violence. The state began by arguing that, while the police were attempting to interview the defendant, numerous other persons were in the detective bureau. The assistant state's attorney then argued: "In the face of all this, the Waterbury police are so arrogant, they are just going to go and beat the crap out of the kid because they can? Why would they do such a thing? It makes no sense, knowing it's a murder case, he's coming to court, there's three guys, we are going to have to testify about this dozens of times. How in the good Lord did you just close your eyes to that? Now, in the absence, in this void, a void derived out of nobody ever asking him but me, [defense counsel] never asked, who were the other cops. Let's bring in all the cops. *Who beat you up? Let's go. Robles beat me up. Jones beat me up. Did somebody come in and say that? No.* [Lawrence] Horne [a witness], you were in the station giving a statement, did you see anybody hit my client . . . ? Any of these guys, please tell me you saw something. No, none of that. Because this fantasy that's been created for you is better served when it's created in a vacuum. I'm the one who has to ask the cop, did you hit this kid? Because if they hit him, it's wrong, and we need to know that." (Emphasis added.)

of fact for the jury.[13] With regard to the state's argument to the effect that the defendant had not testified before the jury that the confession was coerced, the court told the jury that, although the state was entitled to question the absence of evidence of physical coercion, it could not use the defendant's silence as bearing on that question.[14] Then, in its final instructions, the court reiterated

[13] Specifically, the court stated: "Before I get into the instructions, there's a couple comments I would like to make about the arguments . . . just so you don't engage in any type of deliberations that are not allowed, and also so you don't misinterpret what the lawyers had said to you.

"First there was the beginning of a comment about the confession. And you probably know that there was a hearing . . . in this case. And the [n]otion that the state began to advance, was that you can rely on the confession because a judge ruled it admissible. And, that's not actually correct. You cannot look at a confession and say, well, you know it's before us, the judge said it's evidence that we can hear, therefore, it must be a valid confession and we can rely on it. No. . . . [Y]ou cannot reach that conclusion because a judge ruled on the admissibility of a confession. The significance of the confession, and everything about the confession, is a question of fact for you. Whether these words are the words of the defendant, is a question of fact. Whether they were the product of some kind of duress, or anything else, that's [a] question of fact for you, and that's what jury's do. And in reaching that conclusion about what the confession is, and what significance it plays in this case, you cannot rely on the fact that a judge ruled on its admissibility. That just means it's okay for you to consider it."

[14] Specifically, the court stated: "[T]he defendant advances the argument that . . . you cannot rely upon [the confession] because the defendant . . . has evidence of a beating on his face the next day. And that may be why he confessed. At that point, the state is entitled to say, well, where's the evidence of that? That's legitimate argument. When the state says, where's the evidence of that—I want to make this clear to you—when the state says where is the evidence of that, they are not talking about [the defendant] here. He's in a separate category here. He's the defendant. And, so . . . he has no burden to prove anything, and he has the right to remain silent. So, it's proper for the state to say, where is the evidence of the police doing this to the defendant? You cannot take that as any comment on the defendant exercising his constitutional right to remain silent here. You cannot base any decision in this case on the defendant remaining silent in the face of these accusations. That's his right. And I'll go over the formal wording of that in my instructions, but the state does not mean . . . to comment on the defendant not testifying, they did not comment, you should not interpret it in that way. . . . [A]nd, I'll reinforce that once again in my instructions. I just want to make that crystal clear. You cannot base any decision in

that the defendant had the right not to testify, and that the jury could draw no unfavorable inference from his failure to testify.

The trial court's laudably forceful and clear instructions obviated any possible prejudice to the defendant. Thus, we reject the defendant's contention that these remarks fall into the category of misconduct that was irremediable by a proper curative instruction. Cf. *State* v. *Whipper*, 258 Conn. 229, 271–72, 780 A.2d 53 (2001) (curative instruction to disregard state's improper argument as to extraneous matters sufficient to remedy prejudice). " 'The jury [is] presumed to follow the court's directions in the absence of a clear indication to the contrary.' . . . *State* v. *Griffin*, 175 Conn. 155, 160, 397 A.2d 89 (1978); accord *State* v. *Negron*, 221 Conn. 315, 331, 603 A.2d 1138 (1992). 'The rule that juries are presumed to follow their instructions is a pragmatic one, rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process.' *Richardson* v. *Marsh*, 481 U.S. 200, 211, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987)." *State* v. *Booth*, 250 Conn. 611, 626, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000).

The third and fourth challenges of the defendant to the state's final argument were not objected to at trial. Thus, the defendant may only prevail on this claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or the plain error doctrine. We conclude that he may not prevail because neither of the challenged statements constitutes misconduct by the state.

The third statement challenged by the defendant is that the state argued from facts not in evidence. Specifi-

this case, no matter what it might be, on the defendant exercising his constitutional right to remain silent."

cally, in arguing against the defendant's contention that his confession was the product of a beating at the hands of the police, the state argued that the jury could infer that the defendant's injuries were, instead, inflicted by his cohorts, Thompson and Symms.[15] The defendant argues that there was no evidence that the defendant, Thompson and Symms were together prior to the booking photograph, such that Thompson and Symms would have had the opportunity to assault the defendant.

We do not regard this comment as the type of prosecutorial reference to matters not in evidence that constitutes harmful prosecutorial misconduct. "A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. See *State* v. *Copas*, 252 Conn. 318, 336–39, 746 A.2d 761 (2000) (jury's inferences from evidence must be reasonable and founded upon evidence and cannot be based on mere conjecture); *State* v. *Pouncey*, 241 Conn. 802, 811, 699 A.2d 901 (1997) (counsel may not suggest inference from facts not in evidence)." *State* v. *Singh*, 259 Conn. 693, 718, 793 A.2d 226 (2002). The rationale for the rule prohibiting the state from making such a reference is to avoid giving the jury the impression that the state has private information, not introduced into evidence, bearing on the case. Id. As we have indicated previously in this opinion, it would have required speculation, rather than reasonable inference, to state exactly when and how the defendant sustained his injuries. See footnote 10 of this opinion. Thus, the bald assertion by the

---

[15] More specifically, the state argued: "But there's a period of time between when the police were done with him when he was down at that holding area, and what happened, I don't know, but I do know this. [Theresa] Dalton, a very experienced public defender, the second she read that warrant [said to] separate these guys. Separate these guys. Reasonable inference? Up until then, nobody really separated them. So you got two other guys who are sitting there with a guy who gave a confession, putting them all in the soup because . . . Dalton told you that's what was going on."

state that Thompson and Symms inflicted the defendant's injuries in the holding cell may have been improper argument. The assistant state's attorney, however, in advancing the inference, on the basis of Dalton's testimony, that Thompson and Symms may have inflicted the defendant's injuries, specifically told the jury that he did not know what had happened after the defendant was brought down to the holding cell. See footnote 15 of this opinion. Thus, the risk that the jury would get the impression that the state had private information, not introduced into evidence, which had a bearing on the case, was ameliorated. This conclusion is buttressed by the fact that the defendant's counsel did not object, indicating that he did not consider the argument as improper.

The defendant's final challenge to the state's final argument is that the state "used the defendant's invocation of his right to remain silent as evidence of his guilt and to counter the defense that the confession was not voluntary." Specifically, the defendant points to the following argument of the state: "[In conducting the criminal investigation] [w]e go in, and we ask him if you want to talk. You just gave him his rights, right to remain silent. Don't want to talk. Don't know what you are talking about. Okay, fine. Come back two hours later. Hey, guy, we have more stuff here. Do you want it? Jones told him we got more stuff here. Do you want to talk to us? No, no, no. The second time he didn't say I don't know what you are talking about. The second time he said, no. We have a little movement."

Contrary to the defendant's contention, we do not read this as a comment by the state in violation of the defendant's right to remain silent. As the state correctly contends, this argument was made in the context of differing interpretations of the defendant's two prior refusals to talk, as bearing on whether the defendant in fact had confessed. The defendant's counsel had

argued, in support of his contention that the confession had been extracted by force, that his two prior, adamant refusals to talk made it unlikely that he would have confessed voluntarily on the third occasion.[16] The state was countering that the defendant had not been so adamant in the second attempt, making it more likely that, when confronted with more evidence against him on the third occasion, he was then willing to confess. Again, this conclusion is supported by the failure of the defendant's counsel to object, indicating that he did not consider the state's argument as an improper comment on the defendant's silence.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[16] The relevant passage from the defendant's closing argument was as follows: "Jones and Robles go in and ask [the defendant], do you want to say anything? No. Jones says in his testimony—[the defendant said] I don't know what you guys are talking about. That's what he says. That's what Jones says. . . . They leave, some time after midnight, they come back in. . . . Jones goes in there, and explains to [the defendant] I've got all this information . . . now, you want to talk to us. [The defendant] says no, and they leave. Now, when Robles . . . testifies up in court, he says . . . the third time I went in . . . I tell [the defendant] all the stuff that we learned, and then he gives it up. . . . You know, if the guy won't talk to you and after you gather all the information from the witnesses and you tell this guy, and the guy says, I'm not going to talk to you. First he said, I don't know what you are talking about. Then he says, no, I'm not going to talk to you. What else is left? But like a miracle from heaven, like manna from the desert, the new guy comes in . . . and he gets him to confess. He walks in and if you believe this guy, he just confessed."