## STATE OF CONNECTICUT *v.* ALBERTO GARCIA
## (SC 18465)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille,
Zarella and McLachlan, Js.*

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued March 25—officially released November 16, 2010

*Alice Osedach*, assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *John Davenport*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Alberto Garcia, guilty of one count each of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4), and conspiracy to commit robbery in the first degree in violation of § 53a-134 (a) (4) and General Statutes § 53a-48 (a). After the trial court rendered judgment in accordance with the jury verdict,[1] the defendant appealed,[2] claiming that the trial court improperly denied his motion to suppress a statement that he had given to the police at the police station. Specifically, the defendant contends that he is entitled to suppression of his statement because the trial court improperly found, first, that he had not been in police custody when he made the statement and, second, that the statement had been given knowingly, voluntarily and intelligently. The defendant, who speaks Spanish only, also claims that the statement was obtained in violation of his constitu-

---

[1] The trial court sentenced the defendant to a total effective sentence of twenty years imprisonment, execution suspended after ten years, and five years probation.

[2] The defendant appealed to the Appellate Court from the judgment of the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

tional rights to due process and equal protection because it was taken and translated by a bilingual police officer and not by a disinterested, qualified interpreter. We reject the defendant's claims and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. At approximately 8:30 p.m. on the evening of January 21, 2007, three men armed with guns robbed the A & A Food Store (store) in the city of Waterbury. Although each of the intruders wore a mask, Joshua Megmath, the store owner, saw their eyes, noses and mouths. One of the intruders was significantly taller than the other two, and Megmath was familiar with this taller man because he previously had been a customer. The tallest intruder removed the cash drawer from the register, and one of the other intruders ordered Megmath to the floor. After the intruders left, Megmath called the police. Within a few days of the robbery, Megmath went to the police station to view photographs of potential suspects. After viewing hundreds of photographs, Megmath identified the photograph of Jose Vega as the tallest of the three intruders. The police then spoke with Vega, who provided information regarding the robbery, including the location of the cash drawer.[3]

Vega also provided the police with the street names of the two other robbers, that is, "Yayo" and "Pito." Associating one of these names with a person named Mario Echevarria, Detective George Tirado of the Waterbury police department began searching for Echevarria. Tirado learned from Echevarria's mother that "Yayo" was the defendant and "Pito" was a man named Eduardo Perez. Tirado left his contact information with Echevarria's mother and asked her to have the suspects either call him or come to the police sta-

---

[3] Subsequent investigation revealed the presence of the defendant's fingerprints on the cash drawer.

tion. Later that day, on January 24, 2007, the defendant, who speaks Spanish but not English, came to the police station to talk to Tirado, who is bilingual. There, the defendant confessed to planning and robbing the store with two of his friends. Tirado translated the defendant's statement and reduced the statement to writing in English. The defendant then was arrested and charged with robbery in the first degree and conspiracy to commit robbery in the first degree. Following a jury trial, the jury found the defendant guilty of those charges, and this appeal followed. Additional facts and procedural history will be set forth as necessary.

The defendant's sole claim on appeal is that the trial court improperly denied his motion to suppress the written statement that he had given to the police. In support of this claim, the defendant contends that the trial court incorrectly determined that (1) he was not in custody when he made his statement, (2) the statement was not the product of police coercion and was given knowingly, intelligently and voluntarily, and (3) the statement was admissible even though it was given to and translated by a bilingual police officer rather than a qualified interpreter.

The following additional facts and procedural history, which are set forth in the trial court's memorandum of decision on the defendant's motion to suppress, are necessary to our resolution of the defendant's claim. "[Prior to trial, the defendant moved] . . . to 'suppress from evidence all statements . . . that are alleged to have been made by [him]' on January 24, 2007. The defendant claim[ed] that such statements, both oral and written, were obtained 'without a knowing and intelligent waiver of [his] rights against self-incrimination and without the assistance of counsel.' "

After conducting an evidentiary hearing on the defendant's motion, at which both Tirado and the defendant

testified, the trial court made the following relevant factual findings. At approximately 8 p.m. on January 24, 2007, the defendant arrived at the police station to speak with Tirado. The defendant was taken to the detective division and, upon his arrival there, "Tirado escorted him into an interview room. The room was small and contained a desk, a few chairs, a computer and one door. At all times, Tirado was approximately three to four feet from the defendant.

"[Tirado, who was] raised in Waterbury, is of Puerto Rican descent, is fluent in the Spanish language and, although conversant in Spanish . . . is less confident [in] his writing abilities in that language. . . . Tirado [immediately] realized that the defendant did not speak English, and the ensuing conversation and interview [were] conducted entirely in the Spanish language. Only Tirado and the defendant were in the interview room throughout the interview except when [Tirado's supervisor, Lieutenant Christopher] Corbett entered at the end of the session in order to administer [an] oath to the defendant. . . .

"At the outset, Tirado advised the defendant of the nature of the investigation and that the police were investigating 'a bunch of robberies . . . .' [Tirado asked] the defendant if he could read and write in Spanish, and the defendant responded that he could. . . . Tirado then proceeded to advise the defendant of his constitutional rights. Tirado provided the defendant with a 'rights card' . . . [that] contained the constitutional rights in the Spanish language on one side and in English on the other. Tirado explained to the defendant his constitutional rights . . . and the defendant proceeded to read each line of the Spanish version out loud. Tirado advised the defendant that, once he [read] each line, [he should place his initials next to it if he understood what it meant]. . . . [The defendant] acknowledged that he understood his rights, initialed

each line 'AG,' and expressed his desire to waive his rights and to continue speaking with Tirado. The defendant then proceeded to acknowledge his rights and his waiver by . . . affixing his signature at the bottom of the card ('Alberto L. Garcia') and entering the time at 8:21 p.m. Tirado thereupon affixed his signature as a witness.

"[After] [t]he defendant . . . acknowledged that he wished to be interviewed, Tirado began [to] use . . . the computer in order to record [the defendant's] statement. At that time, the computer generated the '[v]oluntary [s]tatement [r]ights [f]orm' . . . which Tirado provided to the defendant. This second form was a repeat of what was contained in [the rights card] . . . [that is] a list of the constitutional rights and a waiver portion. On this [second] form, the Spanish translation appeared on the bottom portion . . . . Tirado provided this [second] form to the defendant, again advis-[ing] him of his constitutional rights in Spanish. . . . [T]he defendant proceed[ed] to read each right and initial the form in acknowledgment that he understood his rights and expressed his intent to waive [them]. The defendant . . . indicated that he wished to be questioned by affixing his signature at the bottom of [the second] form . . . and enter[ed] the time at 8:30 p.m. Tirado then affixed his signature as a witness.

"The defendant related that he was willing to provide a written statement but wanted it known that, although the other suspects with whom he was implicated in the [store] robbery were suspected of involvement in other robberies . . . he [had no involvement with those robberies].

"The defendant related to Tirado his involvement in the [store] robbery in Spanish, and Tirado wrote it down in English. A question and answer format was utilized. Tirado wrote down what was related to him by the

defendant, not word for word, but 'what [he] interpret[ed] . . . the defendant's . . . words' to be. Tirado printed the statement out in English and read it to the defendant in Spanish. The defendant acknowledged that he understood what was read to him in Spanish and related that he did not wish to make changes to the statement. . . . [T]he [defendant's] statement . . . [was] written entirely in the English language. Acknowledging the content, the defendant affixed his initials . . . at the beginning and at the end of the contents on each page of the statement. At the time the statement was completed, Tirado summoned . . . Corbett. . . . Corbett entered the interview room for the express purpose of taking the defendant's oath that the content as translated [was] truthful . . . . [Tirado translated the oath, and it was administered in the presence of both Tirado and Corbett. The defendant then signed his statement, and Corbett also signed as a witness. Based on time stamps inserted by the computer, the defendant began giving his statement at 8:42 p.m. and concluded doing so at 10:22 p.m.] . . . .

"[While Tirado took the defendant's] statement, other officers at the [Waterbury police] department were interviewing other suspects [allegedly involved] in the [store] robbery and were in the process of preparing an arrest warrant for the defendant [related] to [that] robbery. [After Tirado took the defendant's statement], the defendant was advised that he could leave but that warrants were being prepared for all three suspects, including the defendant, and, if he [left the area], he would be arrested imminently. The defendant elected to remain in the . . . interview room [following] the completion of [his] statement . . . [until] shortly after midnight . . . [when he was arrested after the arrest warrant had been signed by a judge]. . . .

"From the time of the defendant's arrival at the [police station] until the time of his arrest, the defendant

was not under arrest and was free to leave. [At no time did the defendant express] reservations or concerns about speaking to Tirado. At no time did Tirado discern any odor or indicia of alcohol or drug [use by] the defendant.

"At all times, the defendant appeared coherent and responsive to the questions posed, and Tirado understood the defendant's [statement]. Tirado found the defendant's demeanor to be very pleasant, [noting that] . . . 'under the circumstances, it was a conversation which we held, I mean, there was no arguing, there was no demeaning, no degrading. He basically from the [beginning] wanted to put his point—I mean, he did not want to get . . . caught up with . . . the . . . involvement of the other three or four robberies that had occurred. His involvement was with the [store robbery], and he wanted to make sure that this was the only one he [was] attached to . . . . [T]herefore, our conversation was pleasant.' "[4]

---

[4] The defendant's testimony at the suppression hearing contradicted Tirado's testimony. The defendant testified that, on the morning of the day that he was interviewed, he encountered Tirado at a local store—not the store at which the robbery occurred—and that Tirado asked him for his wallet. The defendant then testified that, after looking at his identification and asking him to step into the parking lot next to the store, Tirado searched his person, returned his items and informed him that he was free to leave.

The defendant also testified that, at around noon on that same day, his aunt had asked him to drive her to the Waterbury police department to pick up her son. According to the defendant's testimony, upon the defendant's arrival, Tirado told the defendant that he needed to speak with him for roughly twenty minutes. Tirado then removed the defendant's jewelry and left him in one room, alone, for more than five hours. The defendant then was taken to another room, where he was left alone for an additional two and one-half hours before he was taken to the room in which he was interviewed by Tirado, and that he was not provided food, drink or cigarettes at any time. Moreover, the defendant testified that, after he had denied any involvement in the store robbery, Tirado punched him in the chest and face, and that, when he held up his hands to protect his face from further injury, he was struck with a flashlight on his right hand and on the side of his head. Lastly, according to the defendant, he never was shown the rights card, the voluntary statement rights form or his statement, never signed or initialed those documents, and the initials and signatures on those documents differed from his own.

Analyzing the defendant's claims, the trial court first found that, although the defendant had been questioned by Tirado, he was not in custody at that time because he had come to the police department on his own accord out of concern that his coconspirators were cooperating with the police, and he wished to convince the police that he had been involved only in the store robbery and no other robbery.[5] The trial court further found that the defendant had made a knowing, intelligent, and voluntary waiver of his *Miranda* rights[6] because the police twice had read his rights to him in Spanish and he acknowledged that he had received and understood those rights by affixing his initials to the rights card and the voluntary statement rights form.[7]

The trial court next found that the defendant had given his statement knowingly, intelligently and voluntarily. In reaching this conclusion, the trial court found that the defendant read and understood Spanish, that he suffered from no mental illness, that he had not been under the influence of drugs or alcohol, and that he was a "very intelligent, young man . . . ." Moreover, the trial court credited Tirado's testimony that, at the time he took the defendant's statement, the defendant was coherent, responsive to Tirado's inquiries and not overwrought or emotional. Although the trial court did observe that it was undisputed that the defendant had suffered a fracture of the little finger on his right hand,

[5] Although the trial court also found that "[t]he defendant was advised that he was not under arrest and could leave at any time," the defendant asserts, and the state concedes, that there is no evidence that the police informed the defendant that he was free to leave at the time of questioning. Instead, the defendant was informed that he was free to leave only after the interview had concluded.

[6] *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[7] Although the trial court acknowledged that its finding that the defendant was not in police custody at the time he made his incriminating statements obviated the need to analyze whether the defendant properly waived his *Miranda* rights, it nevertheless elected to do so.

in light of the court's finding that the defendant had not been abused by the police, it is apparent that the trial court did not attribute this injury to Tirado or any other police officer. See footnote 4 of this opinion.

The trial court rejected the defendant's testimony that he never saw or signed the rights card, the voluntary statement rights form or his statement and that he had been assaulted by Tirado. First, the trial court found, on the basis of a comparison with the defendant's signatures on his medical records, that the signature on the defendant's statement belonged to him. The trial court also examined the photograph of the defendant that had been taken during his booking procedure and observed that it revealed no evidence of any assault, even though the defendant claimed to have been struck in the head with a flashlight just hours before the booking. The trial court also reviewed the transcript of the defendant's arraignment and found that it contained no statement regarding the alleged assault on the defendant by the police, even though the defendant had testified that he had made such a statement at the arraignment. On the basis of these and other findings, the trial court concluded, contrary to the defendant's testimony, that he had not been assaulted by the police and that his statement was not otherwise the product of coercive police conduct. In light of these facts and findings, we now address the merits of the defendant's arguments in support of his claim that the trial court improperly declined to suppress his written statement.

The defendant first contends that the trial court improperly concluded that he was not in custody when he provided the police with the written statement. The defendant, however, does not challenge the trial court's finding that he was properly advised of his *Miranda* rights before the police started to question him. Consequently, even if we assume, arguendo, that the defendant was in custody when he gave his statement to the

police, that fact does not entitle him to the suppression of his statement because it is axiomatic that a statement taken from a person in custody is admissible as long as that person has been advised of and voluntarily waives his *Miranda* rights. See, e.g., *State* v. *Wallace*, 290 Conn. 261, 266–71, 962 A.2d 781 (2009). Moreover, as we explain more fully hereinafter, the trial court properly concluded that the defendant had provided the statement knowingly, intelligently and voluntarily after being advised of and waiving his *Miranda* rights. In such circumstances, the defendant cannot prevail on his suppression claim even if he had been in police custody when he gave the statement. See, e.g., *State* v. *Barrett*, 205 Conn. 437, 447, 534 A.2d 219 (1987) (*Miranda* warnings "significantly enhance [a defendant's] opportunity to make a knowing, intelligent and voluntary decision whether to speak or remain silent"); see also *State* v. *Santiago*, 245 Conn. 301, 320, 715 A.2d 1 (1998) ("[t]he purpose of *Miranda* warnings is to [en]sure that a confession is the product of an essentially free and unconstrained choice by its maker" [internal quotation marks omitted]).

We also reject the defendant's claim that his statement was not made knowingly, intelligently and voluntarily but, rather, was the product of police coercion. Specifically, the defendant contends that the evidence that he adduced at the suppression hearing—in particular, his testimony that he had been physically abused by the police as evidenced by his broken finger that he suffered while in police custody—warrants the conclusion that his statement had been obtained by force and, therefore, must be suppressed.

The following principles govern our resolution of the defendant's claim. "[T]he use of an involuntary confession in a criminal trial is a violation of due process. . . . The state has the burden of proving the voluntariness of the confession by a fair preponderance of the evidence.

. . . [T]he test of voluntariness is whether an examination of all the circumstances discloses that the conduct of law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined . . . . The ultimate test remains . . . [that is] [i]s the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process. . . . The determination, by the trial court, [of] whether a confession is voluntary must be grounded [on] a consideration of the circumstances surrounding it. . . .

"Factors that may be taken into account [to assess voluntariness], upon a proper factual showing, include: the youth of the accused; his lack of education; his intelligence; the lack of any advice as to his constitutional rights; the length of detention; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food and sleep." (Internal quotation marks omitted.) *State* v. *Lawrence*, 282 Conn. 141, 153, 920 A.2d 236 (2007). When a confession is accompanied by physical violence, however, its voluntariness is not assessed under the totality of the circumstances; rather, it is per se inadmissible. *State* v. *Fields*, 265 Conn. 184, 195, 827 A.2d 690 (2003).

"When we review the voluntariness of a confession, our scope of review is plenary on the ultimate question of voluntariness. . . . Nonetheless, [t]he trial court's findings as to the circumstances surrounding the defendant's interrogation and confession are findings of fact . . . [that] will not be overturned unless they are clearly erroneous. . . . Thus, this limited scope of review applies to the findings regarding whether physical force

was used in obtaining the confession." (Citations omitted; internal quotation marks omitted.) Id., 197.

In the present case, the only evidence suggesting that the police induced the defendant's statement by coercion derives from the defendant's own testimony.[8] The trial court expressly concluded, however, that this testimony was not credible. Instead, the trial court found "from the totality of [the] circumstances that [the] defendant was not assaulted and that there was no police coercion involved [during] the defendant's stay at the [police station]." This finding necessarily means that the trial court determined that the defendant's finger was not broken during the interrogation. See State v. Fields, supra, 265 Conn. 197–98 (trial court's rejection of defendant's testimony that he was assaulted by detective during interrogation and court's implicit acceptance of detective's testimony that he did not assault defendant necessarily meant that defendant's injuries had been inflicted after interrogation). Because this finding is predicated on the trial court's credibility determination, we defer to it. See, e.g., State v. Lawrence, supra, 282 Conn. 155 ("[I]t is within the province of the trial court, when [it is] sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . Credibility must be assessed . . . not by reading the cold printed record, but by observing firsthand the witness' conduct, demeanor and attitude. . . . An appellate court must defer to the trier of fact's assessment of credibility because [i]t is the [fact finder] . . . [who has] an opportunity to observe the demeanor of the witnesses and the parties; thus [the fact finder] is best

---

[8] In addition to his own testimony, the defendant entered into evidence a department of correction medical record entry dated March 6, 2007, which indicated that the defendant had stated that he had been attacked by the police on January 24, 2007—the date on which Tirado questioned him—because the defendant could not understand English.

able to judge the credibility of the witnesses and to draw necessary inferences therefrom." [Internal quotation marks omitted.]).

Although the evidence adduced at the suppression hearing indicates that the defendant's finger had not been injured when he entered the police station, this fact does not require the state to produce evidence explaining the source of the injury. See *State* v. *Fields*, supra, 265 Conn. 198. In other words, we do not presume that the police intentionally inflicted the defendant's injuries for the purpose of coercing a statement from the defendant. Indeed, we declined an invitation to adopt such a rule in *Fields*, concluding that, when a defendant allegedly is injured while in police custody, "[t]he general rule that leaves questions of credibility to the trial court ordinarily will provide ample protection for a defendant who claims that his confession was physically coerced." Id., 200–201. Although we noted in *Fields* that we might, in an appropriate case, "deem the state's simple denials of police inflicted physical violence against a defendant while in police custody insufficient to rebut a defendant's credible claim of such violence"; id., 201; we further observed that that case did not present such an opportunity "because of the trial court's justified rejection of the defendant's testimony [in that case] and the fact that all of the material witnesses [that is, those officers who participated in the interrogation] did testify." Id. Similarly, in the present case, the trial court was fully justified in rejecting the defendant's testimony as lacking in credibility, and the material witness, namely, Tirado, testified at the suppression hearing.

In essence, the defendant contends that the trial court should not have credited Tirado's testimony because the court could have drawn other inferences from the evidence. This approach is inconsistent with our standard of review, which does not require us to ask on

appeal whether the trial court could have made different factual findings on the basis of the evidence presented at trial but, rather, whether the trial court's factual findings were clearly erroneous. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and [to] determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *State* v. *Lawrence*, supra, 282 Conn. 154–55. In light of the lack of corroborative evidence presented by the defendant purporting to demonstrate that he was assaulted by Tirado, and in view of the credibility findings by the trial court, we conclude that the trial court's findings of fact are not clearly erroneous. Accordingly, we also conclude that the trial court properly determined that the defendant's statement had been made knowingly, intelligently and voluntarily.[9]

---

[9] The defendant also maintains that the trial court reasonably could not have found that he had made his statement knowingly, intelligently and voluntarily in view of the fact that he has only a high school education, he does not speak English and he was not assisted by a certified interpreter. The defendant, however, has failed to explain why these facts required the court to conclude that his statement was obtained in violation of his constitutional right to due process. On the contrary, and despite these factors identified by the defendant, there is no reason why the trial court could not have concluded, under the totality of the circumstances, that the defendant had made his statement with a full appreciation of the rights that he was giving up in doing so and, further, that the statement had not been the product of police coercion or overreaching.

The defendant also claims that the failure of the police to provide him with a disinterested, certified interpreter during his questioning by Tirado rendered his subsequent written statement untrustworthy and unreliable, and, therefore, its admission violated his due process right to a fair trial. The defendant further contends that due process also required a verbatim translation of his statement. We agree with the state that this is an evidentiary claim masquerading as a constitutional claim. See, e.g., *State* v. *Walker*, 215 Conn. 1, 5, 574 A.2d 188 (1990) ("the admissibility of evidence is a matter of state law and unless there is resultant denial of fundamental fairness or the denial of a specific constitutional right, no constitutional issue is involved" [internal quotation marks omitted]). In essence, the defendant claims that the trial court improperly permitted the state to introduce the statement into evidence on the ground that it had been sufficiently authenticated.[10]

---

[10] The cases that the defendant cites in support of his due process claim all involve the translation of proceedings at trial; see *United States ex rel. Negron* v. *New York*, 434 F.2d 386, 389–90 (2d Cir. 1970); *State* v. *Sinvil*, 90 Conn. App. 226, 236, 876 A.2d 1237, cert. denied, 275 Conn. 924, 883 A.2d 1251 (2005); *State* v. *Jeudis*, 62 Conn. App. 787, 789–90, 772 A.2d 715, cert. denied, 256 Conn. 923, 774 A.2d 140 (2001); or pretrial hearings. See *United States* v. *Cirrincione*, 780 F.2d 620, 633–34 (7th Cir. 1985); *State* v. *Munoz*, 233 Conn. 106, 133–34, 659 A.2d 683 (1995). Courts regularly distinguish between the provision of interpreters during trial or pretrial proceedings, on the one hand, and during the course of police questioning, on the other. See, e.g., *People* v. *Marquez*, 1 Cal. 4th 553, 571, 822 P.2d 418, 3 Cal. Rptr. 2d 710 (1992) (rejecting defendant's due process claim that use of detective as interpreter during interrogation was improper because claim was "premised on authorities and standards relating to court interpreters at trial" that were inapplicable because detective was "function[ing] as a facilitator for the police investigation," not "as a court interpreter"); cf. *Ortega* v. *State*, 721 So. 2d 350, 351 (Fla. App. 1998) (trial court improperly allowed law enforcement officer to translate for jury Spanish portions of video-recorded statement that defendant had given because, as officer involved in case, he lacked appearance of impartiality and also because he did not take oath required for interpreters and translators). The defendant has failed to provide any authority for the proposition that a certified third party interpreter is required, as a matter of due process, for purposes of police questioning of a non-English speaking suspect. Indeed, this court previously has treated the issue as implicating the need for proper authentication of the defendant's statement, without reference to any potential constitutional violation. See

Viewing the defendant's claim through this lens, we conclude that the trial court did not abuse its discretion in determining that the defendant's confession had been properly authenticated.[11]

The following principles govern our resolution of the defendant's claim. "[T]he trial court has broad discretion in ruling on the admissibility . . . of evidence

State v. *Colon*, 272 Conn. 106, 188–91, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005); *State* v. *Rosa*, 170 Conn. 417, 427 nn.6 and 7, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976); see also *Commonwealth* v. *Alves*, 35 Mass. App. 935, 937, 625 N.E.2d 559 (1993) ("[w]e know of no authority . . . [that] would require police to produce an independent interpreter when questioning a non-English speaking defendant prior to trial"), review denied, 416 Mass. 1110, 629 N.E.2d 1004 (1994); *Commonwealth* v. *Carrillo*, 319 Pa. Super. 115, 132, 465 A.2d 1256 (1983) ("[W]e refuse [the defendant's] invitation to adopt a per se rule that there is an inherent bias, and a violation of due process rights, whenever a police officer is called [on] to serve as a defendant's interpreter at an interrogation. Rather . . . a contention that an interpreter was biased, prejudiced or unfair toward the affected non-English-speaking defendant must be borne out by the record."); F. Einesman, "Confessions and Culture: The Interaction of *Miranda* and Diversity," 90 J. Crim. L. & Criminology 1, 27 (1999) ("[i]t is not unconstitutional . . . for a police officer to serve as an interpreter during custodial interrogation"). Accordingly, we conclude that the defendant's claim is not of constitutional magnitude. Cf. *State* v. *Vilalastra*, 207 Conn. 35, 46–47, 540 A.2d 42 (1988) (treating constitutional claim concerning alleged improper use of expert testimony as evidentiary claim because defendant "failed to cite a single case from any jurisdiction in which a court has held that the erroneous admission of expert testimony concerning an ultimate fact implicates fundamental fairness or constitutes the violation of a specific constitutional right").

[11] Following the conclusion of the evidentiary portion of the hearing on the motion to suppress, defense counsel claimed that the defendant's statement should be suppressed because it had been written in English, by a police officer actively involved in the investigation, and without the safeguard of an independent interpreter. The trial court rejected this claim without explanation. At trial, after Tirado had identified the proffered document as a true and accurate copy of the statement that he had taken from the defendant on January 24, 2007, defense counsel renewed his objection to the state's use of the statement for the same reasons that had been raised at the suppression hearing. The trial court again overruled defense counsel's objection, also without explanation. Thus, although the trial court did not explicitly state that the defendant's statement had been sufficiently authenticated, that conclusion was the necessary implication of its decision to overrule defense counsel's objection.

. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and . . . upset it [only] for a manifest abuse of discretion." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 815, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

Section 1-3 of the Connecticut Code of Evidence provides in relevant part: "(a) . . . Preliminary questions concerning . . . the admissibility of evidence shall be determined by the court." Furthermore, § 9-1 of the Connecticut Code of Evidence provides in relevant part: "(a) . . . The requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be." Additionally, the commentary to § 9-1 (a) of the Connecticut Code of Evidence provides that evidence may be authenticated in a myriad of ways, including testimony from "[a] witness with personal knowledge . . . that the offered evidence is what its proponent claims it to be."

"It is well established that '[a]uthentication is . . . a necessary preliminary to the introduction of most writings in evidence . . . . In general, a writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . .

" 'Both courts and commentators have noted that the showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the

jury, which will ultimately determine its authenticity.' " *State* v. *Carpenter*, supra, 275 Conn. 856.

In the present case, Tirado, a witness with personal knowledge of the facts, identified the proffered statement as the statement that the defendant had made and testified about how he had translated the defendant's oral statement from Spanish into English and then reduced the statement to writing in English. This testimony was sufficient to authenticate the defendant's statement. See *State* v. *Torres*, 85 Conn. App. 303, 317, 321, 858 A.2d 776 (confession from Spanish speaking defendant properly authenticated when police officer who translated confession testified that it was defendant's), cert. denied, 271 Conn. 947, 861 A.2d 1179 (2004). Although the defendant questions Tirado's competence, methodology and potential bias, the ultimate determination of whether the statement was made by the defendant or whether the translation was accurate rested with the jury. Defense counsel was free to, and did, explore these issues on cross-examination.

We reject the defendant's assertion that *State* v. *Rosa*, 170 Conn. 417, 365 A.2d 1135, cert. denied, 429 U.S. 845, 97 S. Ct. 126, 50 L. Ed. 2d 116 (1976), compels a different result. In *Rosa*, the trial court suppressed a written statement that had been elicited from the Spanish speaking defendant, Jose Miguel Rosa. Id., 422. Rosa made his statement in Spanish to a police officer who spoke both English and Spanish. Id., 421. In turn, the bilingual officer translated the statement into English for another officer, who served as a police stenographer by typing the statement in English. Id. After the police stenographer had finished typing, the bilingual officer read the statement to Rosa in Spanish, and Rosa made several corrections and signed all of the pages of the statement. Id., 421–22. The trial court concluded that it was required to suppress the statement because the procedure utilized created the appearance of and oppor-

tunity for impropriety. Id., 422. The trial court, however, did permit the state to use an oral confession that Rosa had given to the bilingual officer in Spanish the following day. See id., 422–23.

Following his conviction, Rosa appealed to this court, claiming, inter alia, that the trial court improperly had allowed the admission of his oral confession. Id., 424. On appeal, the trial court's suppression of the written confession was not at issue. After first concluding that Rosa was not subject to police coercion at the time he made his oral confession, we rejected Rosa's assertion that the oral confession should have been suppressed, even if it was voluntary, on the ground that his invalid written confession had "let the cat out of the bag . . . ." (Internal quotation marks omitted.) Id., 425. We observed that the written confession was not excluded because it was coerced; rather, it was excluded because it had been improperly authenticated because the police stenographer, who did not speak Spanish, had no way of verifying whether the bilingual officer properly had translated Rosa's statement into English. Id., 426–27. Because that prior written statement had not been obtained in violation of the defendant's constitutional rights, his subsequent oral confession was not the inadmissible product of a tainted confession and thus the oral confession was admissible. Id., 427. In dictum, we noted that the suppressed statement *could* have been authenticated in many ways, for example, by using an impartial interpreter or a bilingual stenographer who would have been able to corroborate the accuracy of the bilingual officer's translation. Id., 427 n.6.

In *State* v. *Colon*, 272 Conn. 106, 864 A.2d 666 (2004), cert. denied, 546 U.S. 848, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005), however, we retreated from certain parts of the analysis that we had employed in *Rosa* and limited that case to its facts. See id., 191. In *Colon*, the police translated and transcribed a confession from the Span-

ish speaking defendant, Ivo Colon, using a procedure similar to that used by the officers in *Rosa*. Id., 189, 191. Specifically, Lieutenant Michael Ricci, who did not speak Spanish, presented Officer Randolph Velez, who spoke both English and Spanish, with questions in English, and Velez translated each such question into Spanish for Colon. Id. Colon then answered the questions in Spanish, and Velez translated the answer into English for Ricci, who typed the answer into a computer. Id., 189. In addition, Velez read what Ricci had typed back to Colon. Id. After Colon had finished giving his statement, Velez read it to him in Spanish, and Colon signed it. Id. At trial, Colon moved to suppress the statement on the ground that it had been insufficiently authenticated. See id., 134, 188. The trial court denied the motion to suppress; id., 134; and, on appeal to this court following Colon's conviction, we rejected Colon's claim that, under *Rosa*, the trial court should have suppressed the statement. See id., 189–91.

Although we observed that the procedures that the officers employed in taking Colon's statement were similar to those that were employed in *Rosa*, we concluded that *Rosa* was distinguishable because Velez read what Ricci, the stenographer, was typing on the computer screen and confirmed that it was accurate, and Velez also testified at trial and was subject to cross-examination. Id., 191. We also relied on the fact that Colon did not challenge Velez' ability as a translator. Id. We conclude that the present case is governed by *Colon*. In this case, as in *Colon*, the bilingual officer, namely, Tirado, served as the translator, verified the accuracy of the transcription and also was subject to cross-examination, both at the suppression hearing and at trial.[12]

[12] It is true that, in contrast to the factual scenario presented in *Colon*, only one officer participated in the questioning of the defendant in this case. That fact, however, is irrelevant to our analysis and decision in the present case because the second officer in *Colon*, namely, Ricci, did not speak Spanish, and, thus, his presence did not serve as a safeguard with respect to the accuracy of the translation. Accordingly, *Colon* does not require the

Furthermore, although the defendant in the present case challenges Tirado's ability as a translator, he has not established that the trial court's finding concerning Tirado's fluency in Spanish was clearly erroneous. Indeed, the trial court made this finding after pointed cross-examination during the suppression hearing. Finally, the defendant's assertion that Tirado cannot read or write in Spanish is belied by the record, which reflects the fact that Tirado merely "[was] less confident [in] his writing abilities in that language." Thus, we perceive no material distinction between the facts of *Colon* and those of the present case. We conclude, therefore, that the trial court properly permitted the state to use the defendant's written confession.[13]

The defendant finally claims that the admission of his statement violated his right to equal protection because

presence of two officers when the defendant speaks in a language other than English and an officer is serving as an interpreter.

[13] We decline the defendant's invitation to adopt a prophylactic rule, under our supervisory authority over the administration of justice, requiring that a certified, third party interpreter be made available during the interrogation of all non-English speaking suspects. "[O]ur supervisory powers are invoked only in the rare circumstance [in which the] traditional protections are inadequate to ensure the fair and just administration of the courts . . . ." (Internal quotation marks omitted.) *Smith* v. *Andrews*, 289 Conn. 61, 79, 959 A.2d 597 (2008). In light of the protections against overreaching by the police afforded to criminal suspects under the fifth and fourteenth amendments to the United States constitution and the authentication requirements imposed by § 9-1 of the Connecticut Code of Evidence, we are not persuaded that the failure of the police to provide such an interpreter threatens "the integrity of a particular trial . . . [or] the perceived fairness of the judicial system as a whole" so as to warrant the exercise of our supervisory authority. (Internal quotation marks omitted.) *State* v. *Marquez*, 291 Conn. 122, 166, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). We note, however, that, just as "videotaping confessions would greatly aid both the . . . court[s] and . . . jur[ies] in evaluating the voluntariness and, ultimately, the reliability of those confessions"; *State* v. *Lawrence*, supra, 282 Conn. 185 (*Palmer, J.*, concurring); a practice of providing a certified, third party interpreter during interrogations involving non-English speaking suspects also would resolve questions as to the accuracy of translations.

General Statutes § 46a-33a (e) requires that any person providing interpreting services during the interrogation of deaf or hearing impaired persons—a group that the defendant contends is similarly situated[14] to non-English speakers—must possess certain qualifications and register with the state commission on the deaf and hearing impaired.[15] We reject this claim because the defendant has not persuaded us that persons who do not speak English are similarly situated to persons who suffer from a disability that requires them to rely on a nonverbal mode of communication, such as sign language. As the state asserts, "[t]he inability to hear, unlike the inability to speak English, poses a significant obstacle to a deaf person's ability to function in society," and persons who speak only Spanish suffer no comparable obstacle. Moreover, even if we assume, arguendo, that deaf persons and non-English speaking persons are similarly situated for purposes of the defendant's equal protection claim, the defendant has failed to demonstrate why suppression of his confession is the appropriate remedy for any possible equal protection violation when, as in the present case, there has been no showing that the defendant suffered any harm as a result of the allegedly disparate treatment. Cf. *United States* v. *Nichols*, 512 F.3d 789, 794 (6th Cir. 2008) ("we are aware of no court that has ever applied the exclu-

[14] "[T]he equal protection clause places no restrictions on the state's authority to treat dissimilar persons in a dissimilar manner. . . . Thus, [t]o implicate the equal protection [clause] . . . it is necessary that the state [law] . . . in question, either on its face or in practice, treat persons standing in the same relation to it differently. . . . [Accordingly], the analytical predicate [of an equal protection claim] is a determination of who are the persons [purporting to be] similarly situated." (Internal quotation marks omitted.) *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 158, 957 A.2d 407 (2008).

[15] The defendant failed to raise this claim at trial. He therefore seeks review of his unpreserved claim under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). Because the record is adequate for our review of the defendant's equal protection claim, we consider the merits of the claim.

sionary rule for a violation of the [f]ourteenth [a]mendment's [e]qual [p]rotection [c]lause"); but see *State* v. *Segars*, 172 N.J. 481, 493, 799 A.2d 541 (2002) (for purposes of equal protection clause of New Jersey constitution, suppression is proper remedy for equal protection violation). Indeed, the defendant has provided no authority for the proposition that a confession obtained by a person who lacks the proper certification under § 46a-33a from a suspect who is hearing impaired must be suppressed solely because of that lack of certification. We therefore reject the defendant's equal protection challenge to the admission of his written statement.

The judgment is affirmed.

In this opinion the other justices concurred.