******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ZARELLA, J., with whom ESPINOSA and VERTE-FEUILLE, Js., join, concurring. Although this court has broad discretion in determining whether to invoke its supervisory authority, and may do so to implement remedies beyond the constitutional minimum, invoking this authority too easily and too often can undermine the very integrity of the judicial system that this authority is designed to protect. In my view, this court should expressly adhere to certain limiting principles when invoking its supervisory authority, regardless of the type of case before it. Applying the same standard in all cases avoids the appearance of arbitrary decision making and maintains the integrity of the judicial system as a whole. Thus, I would adopt a consistent standard with respect to our invocation of supervisory authority. Because I am not convinced that this standard has been satisfied in the present case, I conclude that this court should not invoke its supervisory authority to direct courts to refrain from giving the jury instruction at issue.[1] Accordingly, I respectfully concur.

I begin with a brief summary of the general principles that guide this court's invocation of its supervisory powers. "Although [a]ppellate courts possess an inherent supervisory authority over the administration of justice . . . [that] authority . . . is not a form of free-floating justice, untethered to legal principle. . . . Our supervisory powers are not a last bastion of hope for every untenable appeal." (Internal quotation marks omitted.) *State* v. *Wade*, 297 Conn. 262, 296, 998 A.2d 1114 (2010). Accordingly, this court has "note[d] the reluctance with which we have occasionally exercised our supervisory authority." *State* v. *Marquez*, 291 Conn. 122, 166, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). This reluctance stems from the fact that our supervisory powers are an extraordinary remedy that should be used "sparingly." *State* v. *Rose*, 305 Conn. 594, 607, 46 A.3d 146 (2012).

To ensure prudence, this court traditionally has adhered to certain limiting principles. First, this court has acknowledged that "[c]onstitutional, statutory and procedural limitations are generally adequate to protect the rights of the defendant and the integrity of the judicial system." *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998). Supervisory authority thus should be exercised only "in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts." Id. Second, supervisory authority should be "invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for *the perceived*

*fairness of the judicial system as a whole.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Wade*, supra, 297 Conn. 296. Overall, "the integrity of the judicial system serves as a unifying principle behind the seemingly disparate use of our supervisory powers." (Internal quotation marks omitted.) *State* v. *Anderson*, 255 Conn. 425, 439, 773 A.2d 287 (2001). "[A]dherence to this unifying principle mitigates against the specter of arbitrary, result oriented, and undisciplined jurisprudence that may be a potential risk of the expansive use of our supervisory powers." *State* v. *Elson*, 311 Conn. 726, 771, 91 A.3d 862 (2014).

This court has recently noted that we have exercised our supervisory powers in two different types of cases. See id., 768 n.30. "In the first category are cases [in which] we have utilized our supervisory power[s] to articulate a procedural rule as a matter of policy, either as holding or dictum, but without reversing convictions or portions thereof. In the second category are cases [in which] we have utilized our supervisory powers to articulate a rule or otherwise take measures necessary to remedy a perceived injustice with respect to a preserved or unpreserved claim on appeal." Id. "Our cases have not always been clear as to the reason for this distinction." *State* v. *Diaz*, 302 Conn. 93, 107 n.11, 25 A.3d 594 (2011). The court recently clarified in *Elson* that "the first category consists of cases [in which] there was no perceived or actual injustice apparent on the record, but the facts of the case lent themselves to the articulation of prophylactic procedural rules that might well avert such problems in the future." *State* v. *Elson*, supra, 311 Conn. 768–69 n.30.

Despite this clarification, the court did not address what standard applies to each category of cases in which we have exercised our supervisory powers. In my view, the invocation of supervisory authority in all categories of cases should be governed by the same limiting principles. That is, in every case in which this court considers whether to invoke its supervisory authority, the court should consider (1) whether traditional protections are adequate to ensure the fair and just administration of the courts, and (2) whether the issue presented affects the perceived fairness of the system as a whole. This analysis is consistent with the "narrow purpose" behind our supervisory authority, namely, that, "[i]n each case in which we have invoked our supervisory authority, we have acted to provide additional procedural safeguards for some salient aspect of the right to a trial before an impartial jury." *State* v. *Smith*, 275 Conn. 205, 242, 881 A.2d 160 (2005). Moreover, adhering to these principles provides a check on our otherwise unfettered discretion and avoids the appearance of arbitrary decision making, thereby maintaining the integrity of the system that our supervisory authority is designed to protect.

The majority observes that, in some cases in which this court has invoked its supervisory authority to create a prophylactic rule, it has done so in a more cursory fashion. In my view, this court has been invoking its supervisory powers too easily and too often, and imposing a single, consistent analytical standard in all cases would help curb this excess. Moreover, this court has never determined that a less stringent standard should be used in this category of cases. In fact, it seems that, at times, the court has considered traditional protections and the perceived fairness of the system as a whole even when considering but declining to adopt a prophylactic rule. For instance, in *State* v. *Garcia*, 299 Conn. 39, 61 n.13, 7 A.3d 355 (2010), this court declined to adopt a prophylactic rule pursuant to its supervisory authority, reasoning that the protections offered by the fifth and fourteenth amendments of the federal constitution and the Connecticut Code of Evidence were sufficient to safeguard the just administration of the courts. Specifically, the court stated: "In light of the protections against overreaching by the police afforded to criminal suspects under the fifth and fourteenth amendments to the United States constitution and the authentication requirements imposed by § 9-1 of the Connecticut Code of Evidence, we are not persuaded that the failure of the police to provide [a certified, third party] interpreter [during interrogations of all non-English speaking suspects] threatens the integrity of a particular trial . . . [or] the perceived fairness of the judicial system as a whole so as to warrant the exercise of our supervisory authority." (Internal quotation marks omitted.) Id. Moreover, the court has continuously emphasized, even with respect to the creation of prophylactic rules, that its supervisory authority should be exercised sparingly. *State* v. *Smith*, supra, 275 Conn. 241; see id., 240–41 ("Historically, the exercise of this court's supervisory powers has been limited to the adoption of judicial procedures required for the fair administration of justice. . . . Accordingly, *we exercise our supervisory authority sparingly* and then, typically, only to provide procedural guidance . . . ." [Citations omitted; emphasis added; internal quotation marks omitted.]). Because our case law makes it abundantly clear that this court should be cautious when invoking its supervisory powers, it also is clear that supervisory authority is an extraordinary remedy, regardless of whether an individual defendant's conviction is reversed.[2]

In the present case, I am not convinced that the limiting principles governing our invocation of supervisory authority have been satisfied. I begin with the relevant language of the challenged instruction:[3] "The state . . . does not want the conviction of an innocent person. The state is as much concerned in having an innocent person acquitted as in having a guilty person convicted."

After considering this language, it does not appear

that traditional protections, such as the majority's constitutional analysis, are inadequate to ensure the fair and just administration of the courts. There also is no indication that the use of this instructional language has implicated the perceived fairness of the system as a whole,[4] especially because the challenged language is factually correct. Thus, I would not invoke our supervisory authority to create a prophylactic rule in the present case.

The majority posits that "the challenged language, when viewed in isolation or unsupported by instructions such as those given in the present case, potentially could be misconstrued to suggest that *the state does not bring charges against innocent individuals* and, therefore, that the defendant must be guilty." (Emphasis added.) I disagree. The instruction provides that the state does not want an innocent person *to be convicted*, not that the state does not bring charges against persons who might later be acquitted. In fact, this language appears to support the notion that the state may prosecute individuals who may turn out to be innocent. This is so because the state could not want an individual who is innocent *to be acquitted* if the state had not charged the innocent person in the first instance. As this court has previously noted with respect to a substantially similar charge, the language does "not instruct that the state *prosecutes* only guilty people . . . but rather that the state requires the *conviction* of only the guilty."[5] (Emphasis added; internal quotation marks omitted.) *State* v. *Lawrence,* 282 Conn. 141, 180, 920 A.2d 236 (2007).

The harmlessness of this instruction is even more apparent after a review of the case law in which the same or a similar instruction is found. For instance, in *State* v. *Schiappa*, 248 Conn. 132, 167–68, 728 A.2d 466, cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999), the defendant claimed that the following jury instruction regarding reasonable doubt violated her constitutional rights:[6] "But you must keep in mind that this rule of law is made to protect the innocent and not the guilty." (Emphasis omitted; internal quotation marks omitted.) Id., 170–71. The court found this language problematic but nonetheless determined that it did not rise to the level of a due process violation. Id., 172–73. In reaching this conclusion, the court reasoned that other language in the jury instructions mitigated against the harmful effect of the challenged language, and, thus, the charge as a whole did not violate the defendant's constitutional rights. See id. The court, however, ultimately elected to exercise its supervisory authority in directing trial courts to refrain from using the challenged language. Id., 175. The court reasoned that, "[b]ecause the guilty as well as the innocent are entitled to the protections afforded by the presumption of innocence and the reasonable doubt standard, the challenged portion of the charge, when viewed in isola-

tion, [gave] rise to a danger of juror misunderstanding." Id.

The court's decision in *Schiappa* is notable for two reasons. First, the language that the court found to be troublesome is far more harmful to defendants than the language at issue in the present case. In *Schiappa*, the challenged language could be misunderstood to imply something factually incorrect, namely, that the reasonable doubt standard does not serve to protect defendants who are guilty. In contrast, the instruction at issue in the present case correctly informs the jury that the state desires the right outcome, that is, the acquittal of an innocent person and the conviction of a guilty person. As I previously explained, the only implication that reasonably can be drawn from this instruction is that the state recognizes that innocent people do get tried for crimes and should not be convicted. This supports the presumption of innocence that all those charged with a crime enjoy.

Second, the court in *Schiappa* considered language similar to the language at issue in the present case in its constitutional analysis and presumably determined that this language *supported* the jury's proper understanding of the presumption of innocence.[7] See id., 172–73. Specifically, the court reasoned that the defendant's constitutional rights were not violated because the charge, considered as a whole, "in clear and legally correct terms, repeatedly apprised the jury regarding the presumption of innocence and the state's burden of establishing guilt beyond a reasonable doubt." Id., 172. In fact, the court characterized the charge as "repeated explanations of the presumption of innocence and the state's burden of proving the defendant guilty beyond a reasonable doubt . . . ." Id., 173. Because language similar to the language at issue in the present case was contained within the same paragraph as the language challenged in *Schiappa*, the court must have considered the language at issue in the present case in its analysis. Thus, it is logical to conclude that, if the language at issue in the present case was harmful to defendants, the court in *Schiappa* would have exercised its supervisory authority to prohibit its use, or, at the very least, taken note of its potentially damaging effect. Instead, the court in *Schiappa* appears to have deemed this language as not only harmless but helpful in mitigating against the damaging effects of the language that the court found troublesome in *Schiappa*.

Accordingly, because it has not been shown that traditional protections are inadequate or that the perceived fairness of the system as a whole has been called into question, I would decline to invoke our supervisory authority in the present case.

[1] I note that I agree with the majority with respect to the defendant's evidentiary and constitutional claims.

[2] The oft-cited language characterizing the exercise of our supervisory powers as an "extraordinary remedy" can be found in many of this court's

cases: "Our supervisory powers are not a last bastion of hope for every untenable appeal. They are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks omitted.) *State* v. *Marquez*, supra, 291 Conn. 166; accord *State* v. *Coward*, 292 Conn. 296, 315, 972 A.2d 691 (2009); *State* v. *Hines*, supra, 243 Conn. 815. Thus, the exercise of our supervisory powers is an extraordinary remedy, regardless of how it is implemented in an individual case. This language reveals that the extraordinary remedy is not the reversal of an individual defendant's conviction but, instead, the *exercise of our supervisory powers*. Thus, to the extent that the majority suggests that we may invoke our supervisory authority to create prophylactic rules in cases that are not extraordinary, I strongly disagree.

[3] The relevant portion of the trial court's jury instruction regarding the presumption of innocence and reasonable doubt is reproduced in the majority opinion. See part II of the majority opinion.

[4] Although this court has previously not determined, at least expressly, whether the use of this language is permissible, the Appellate Court, in *State* v. *Wilson*, 71 Conn. App. 110, 120–21, 800 A.2d 653, cert. denied, 262 Conn. 905, 810 A.2d 272 (2002), determined that trial courts should avoid using such language. The fact that some trial courts have not adhered to the Appellate Court's decision in *Wilson* does not compel the conclusion that the use of this language is, or would remain, pervasive after a strong warning from this court.

[5] The jury instruction in *State* v. *Lawrence*, 282 Conn. 141, 920 A.2d 236 (2007), provided in relevant part: "The state does not want the conviction of any person whose guilt upon the evidence there is a reasonable doubt." (Emphasis omitted; internal quotation marks omitted.) Id., 179.

[6] As I explain, the charge in *Schiappa* also included language similar to the language at issue in the present case. See footnote 7 of this opinion.

[7] The jury instruction in *Schiappa* also contained language similar to the language at issue in the present case: "Now, the state does not desire the conviction of an innocent person or any person whose guilt upon the evidence is in the realm of reasonable doubt. The state has as much concern in having an innocent person acquitted as in having a guilty person punished." (Internal quotation marks omitted.) *State* v. *Schiappa*, supra, 248 Conn. 170.

---